M.G.M. CONSTRUCTION CORP., A NEW JERSEY CORPORATION, PLAINTIFF, v. NEW JERSEY EDUCATIONAL FACILITIES AUTHORITY, A PUBLIC BODY CORPORATE AND POLITIC OF THE STATE OF NEW JERSEY; SUSSNA DESIGN OFFICE, A NEW JERSEY PROFESSIONAL ASSOCIATION; AND FIDELITY & DEPOSIT COMPANY OF MARYLAND, AN INSURANCE COMPANY AUTHORIZED TO DO BUSINESS IN NEW JERSEY, DEFENDANTS.

Superior Court of New Jersey
Law Division Mercer County

Decided May 13, 1987.

*Thomas A. Kowalczyk* for plaintiff (*Kimmelman, Wolff & Samson,* attorneys).

*Shirley Allen* for defendant New Jersey Educational Facilities Authority (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*Robert E. Corcoran* for defendant Sussna Office Design (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys).

*S. Gordon Elkins* of the Pennsylvania Bar admitted *pro hac vice,* for defendant Fidelity & Deposit Company of Maryland (*Robert E. Edwards* and *Stradley, Ronon, Stevens & Young* of Pennsylvania, attorneys).

CARCHMAN, J.S.C.

On November 14, 1983 plaintiff M.G.M. Construction Corporation (hereinafter referred to as "MGM") and defendant New Jersey Educational Facilities Authority (hereinafter referred to as "NJEFA") entered into a contract to perform construction work on the dining service expansion at Trenton State College. NJEFA also entered into identical contracts with defendant Sussna Design Office (hereinafter referred to as "Sussna") for architectural and design services and Bilman Mechanical Contractors, Inc. (hereinafter referred to as "Bilman") for plumbing, heating, ventilation and air conditioning services on the

project. MGM, Sussna and Bilman were all designated as co-prime contractors.

All contracts required the co-prime contractors to furnish to NJEFA surety bonds with payment and performance obligations. The bonds were to be provided in a separate performance obligation and payment obligation with each written in a penal sum equal to 100% of the contract price; alternatively the bonds were to be combined as a single instrument which would reflect a penal sum equal to 200% of the contract price. Bilman satisfied its bond obligation to NJEFA by securing a single instrument payment and performance bond from defendant Fidelity & Deposit Company of Maryland (hereinafter referred to as "F & D") in a penal sum equal to 200% of the contract price. Thereafter, Bilman defaulted, and pursuant to its performance obligations under the bonds F & D undertook efforts for completion of Bilman's obligations under the contract.

MGM brought this action alleging that as a result of Bilman's default the project was delayed, and MGM suffered damages. In count six of the complaint, MGM seeks to recover against F & D as Bilman's surety. MGM claims to be a third-party beneficiary of Bilman's bond and the contract with F & D.

F & D now moves to dismiss count six of the complaint.[1] The issues presented are whether MGM, as a co-prime contractor, is a third-party beneficiary of a single instrument payment and performance bond executed by Bilman as principal, F & D as surety, and NJEFA as obligee and whether MGM has a cause of action directly against F & D for the alleged damages caused by Bilman.

The relevant portions of the bond provide as follows:

---

[1]MGM has been granted leave to amend the complaint to add additional counts alleging damages arising from F & D's action or failure to act upon assuming its performance obligations pursuant to the bond. This amendment does not have any bearing on the issue presented before this court on the present application.

> Now, if the said principal [Bilman] shall well and faithfully do and perform the things agreed by the owner [NJEFA] to be done and performed according to the terms of the said contract, and shall pay all lawful claims of subcontractors, materialmen, laborers, persons, firms or corporations for labor performed, or materials ... used ... in the carrying forward, performing or completing of said contract, we agreeing and assenting that this undertaking shall be for the benefit of any subcontractor, materialman, laborer, person, firm or corporation having a just claim, as well as for the obligee [NJEFA] herein, then this obligation shall be void; otherwise the same shall remain in full force and effect; it being expressly understood and agreed that the liability of the surety [F & D] for any and all claims hereunder shall in no event exceed the penal amount of this obligation as herein stated. [*See N.J.S.A.* 2A:44–147]

The contract executed between Bilman and NJEFA contains the following applicable language:

> The Contractor agrees that he will make no claim for damages against the Authority by reason of any act, error or omission, of any other Contractor, the Architect/Engineer, or in connection with such other Contractor, or the Architect/Engineer. The Contractor shall have a right to pursue such claims for damages from the responsible Contractors or Architect/Engineers.

The contract further provides for mutual responsibility on the part of the various co-prime contractors (co-primes) whereby they agree to cooperate with each other in the scheduling of work and other matters so as to facilitate the completion of the project. The mutual responsibility provisions provide that if a co-prime's actions or failure to act results in delay, the remedy is an action against the co-prime; any action against the NJEFA is covered by the following language:

> ... If the contractor or subcontractor suffering such loss or damage shall assert any claim or suit against the Authority, the Authority shall notify the culpable contractor or subcontractor who shall defend, indemnify and save harmless the Authority against any such claims.

The bond in question is a statutorily created contract bond mandated by *N.J.S.A.* 2A:44–143 *et seq.* All parties agree that the Legislature intended to, and indeed did, create certain third-party rights in the payment provisions of the bond; however, MGM disputes that these rights are restricted and limited to the payment obligation. F & D argues that the class of third parties entitled to assert claims under the bond include those who *performed* work on or *pursuant* to the underlying contract, *e.g.*, laborers and materialmen and as MGM does not fall

within that specific class, it has no third-party rights in the *performance* provisions of the bond. F & D further urges that had the Legislature intended nonparty claimants, such as MGM to have third-party rights in the performance provisions of the bond, it would not have expressly created such rights in a limited class. MGM suggests that the issue is one of intent, and while the intent is not explicitly stated here, MGM is implicitly included in such class.

It is well settled in New Jersey that contract interpretation must be based on the intent of the parties. *See Ace Stone Inc. v. Wayne Township*, 47 *N.J.* 431, 439 (1966); *Tessmar v. Grosner*, 23 *N.J.* 193, 201 (1957). To determine intent with a degree of certainty, the court must consider many factors, including the document itself and the surrounding circumstances. The issue of intent is critical to a determination as to whether one may be considered a third-party beneficiary under a contract. *Broadway Maintenance Corp. v. Rutgers*, 90 *N.J.* 253 (1982); *Gold Mills Inc. v. Orbit Processing Corp.*, 121 *N.J.Super.* 370 (Law Div.1972).

The first analysis requires a determination as to whether the plain language of the bond specifically extends F & D's obligation to parties other than Bilman and NJEFA. When the bond itself is examined, not only is it clear that the surety, F & D, was guaranteeing Bilman's performance under the contract Bilman executed with NJEFA but that this was the only contract to which the bond was intended to apply. The bond states that F & D was to pay all lawful claims of "subcontractors, materialmen, laborers, persons, firms or corporations for labor performed or materials ... used ... in the carrying forward, performing or completing of *said contract....*" Emphasis supplied. This payment language specifically refers only to those who are parties to the contract executed by and between between Bilman and NJEFA. Bilman agreed to pay the claims of those involved in the Bilman–NJEFA contract. Had Bilman failed to make such payments, F & D would have been compelled to do so as the guarantor under the payment bond.

The requirement of a direct contractual relationship as a prerequisite to liability under the bond is supported by a reading of the contract executed by Bilman and NJEFA, where the duty to supply a bond was created. The contract outlined Bilman's duty to furnish bonds "as security for the payment of all persons performing labor ... under *this contract* and furnishing materials in connection with *this contract....*" Emphasis supplied. The use of the words "this contract" made it clear that the bonds were to benefit only parties to the Bilman–NJEFA contract. Likewise, the bonds furnished by other contractors on the project were to be for the benefit of parties to those contracts. As MGM was not a party to the Bilman–NJEFA contract, a strict interpretation of the bond and contract supports the conclusion that MGM cannot claim against the surety under the payment provisions of the bond.

A review of the language in the bond evidences the intent to create a specific class of persons entitled to claim thereunder. The payment portion of the bond creates third-party beneficiary rights in those who furnished labor and materials under the Bilman–NJEFA contract. As noted above, MGM cannot claim under this section because it furnished labor and materials under its own contract with NJEFA, not under the Bilman contract. The performance obligation of the bond, moreover, names only the owner (NJEFA) as the beneficiary. There is no reference, explicit or implicit, to any other beneficiaries. F & D claims that the inclusion of specific third-parties in the payment portion evidences an awareness, on the part of the parties to the bond (and the Legislature), of how to create third-party rights, and a desire to do so under limited circumstances. In considering the plain language of the bond, the absence of such third-party rights in the performance provision evidences an intent, by way of exclusion, not to create those rights.

While the issue presented here is a matter of novel impression in New Jersey, it has been dealt with in other jurisdictions, and the majority rule precludes the recognition of the third-party rights urged by MGM.

In *VanCor Inc. v. American Casualty Company*, 417 *Pa.* 408, 208 *A*.2d 267 (Supreme Ct. 1965), the Pennsylvania Supreme Court was confronted with the same issue and facts similar to those presented in this case. VanCor was the successor to Van Campen, which had contracted to perform general construction work on a junior high school. A separate contract for the electrical work was awarded to Zucker. American Casualty issued two bonds on behalf of Zucker: a performance bond and a labor and materialmen bond. Zucker failed to complete its work under the contract and was replaced by another contractor. VanCor brought suit for damages allegedly suffered as a result of the delay caused by Zucker's default. American Casualty argued that it was only liable to the obligee, not the other contractors. VanCor alleged that the terms of Zucker's contract were incorporated into the bond, thus rendering defendant liable for Zucker's default.

The Pennsylvania Supreme Court determined that both parties to a contract must agree that third parties are to be beneficiaries and must express such an intent before third parties are able to recover. Denying third-party beneficiary status to VanCor, the court noted:

> It must be kept in mind that we are considering [VanCor] status as a third-party beneficiary not only of the electrical construction contract but also of the contract executed by [American Casualty]. The parties involved here knew how to provide for third-party beneficiaries when they wrote into the contracts ... that the contractor covenants and agrees to pay for all labor and material furnished in the performance of the contract. That they knew how to insert such a provision in a surety bond is evidenced by the wording of the condition of the labor and materialmen's bond here in suit.... [208 *A*.2d at 270]

The court found no evidence of an intention of the parties to make VanCor a third-party beneficiary entitled to recover for delay damages from the surety.

MGM argues as did VanCor that the contract between Bilman and NJEFA contained several provisions demonstrating the necessary intent. These included the promise of Bilman to cooperate with other contractors to facilitate progress on the project, and Bilman's promise to compensate its co-primes for

Bilman's breach of the contract. MGM suggests that these promises are persuasive indicators that MGM was an intended third-party beneficiary. First, MGM argues that the provisions demonstrate an intent on the part of the contracting parties to benefit the co-primes. Second, MGM contends that the promise to pay demonstrates that the damaged co-primes are intended beneficiaries entitled to enforcement. MGM concludes that this court should find that the terms of the Bilman-NJEFA contract were incorporated into the bond. MGM concludes that as an intended beneficiary under the contract, it is an intended beneficiary under the bond. This, of course, was the same argument rejected in *VanCor* and the other jurisdictions that have addressed the issue.

In *Novak & Co. Inc. v. Travelers Indemnity Co.*, 56 *App. Div.*2d 418, 392 *N.Y.S.*2d 901 (Supreme Ct., App.Div.1977), Novak entered into a contract with the New York Housing Authority to perform plumbing work, while Wilaka entered into a similar contract for general construction and concrete work. Travelers, the surety, furnished a performance and a payment bond to secure against Wilaka's failure to perform under the contract. The performance bond stated that it was to benefit subcontractors, workmen, materialmen and all other third persons with just claims arising out of or *in connection with* the contract. The payment bond's language indicated that all who had performed labor, rendered services or furnished materials or supplies had a direct action against Wilaka. The performance bond declared that rights of all beneficiaries were subject to and subordinate to those of the owner, but the payment bond was silent as to that issue.

Novak claimed against Travelers to recover damages as a result of Wilaka's default. The New York Supreme Court, Appellate Division held that the parties' intent was key to determining whether the bonds created third-party rights in one who was not party to the contract.

The performance bond did not authorize Novak's suit, while the payment bond authorized a direct right of action against the surety for the class of claimants authorized in the bond. Novak was not in the class set forth in the payment bond as one entitled to prosecute a direct claim against the surety. In language which is particularly applicable to the case at bar, the court stated:

> But the inclusion of a specific authorization for a direct right of action in the payment bond, as contrasted with the omission of such a provision in the performance bond, is most relevant on the issue of whether the performance bond was ever intended to create a direct right of action in the plaintiff against the defendant surety when its judgment against Wilaka proved uncollectible. The very fact that the payment bond specifically authorized certain claimants to bring action against the surety while the performance bond contained no such authorization is an indication that the parties to both bonds, Wilaka, the Authority and the defendant, had no intention of extending the benefits of the performance bond to a claimant such as the plaintiff. The maxim *inclusio unius est exclusio alterius* supports this conclusion. [*Novak*, 392 *N.Y.S.*2d at 907]

Noting that the specific authorization in the payment bond and the absence of such in the performance bond were relevant factors in deciding whether the parties intended to create rights in Novak in the performance bond as against the surety, the court determined that the parties did not intend to extend the performance bond benefits to claimants such as Novak. The court added in language applicable here;

> These provisions clearly negate any intention on the part of the Authority, the obligee of the performance bond, to award third-party benefits, such as are here sought by plaintiff under defendant's performance bond, by imposing on the surety the additional duty of having to insure payment of any judgment obtained against Wilaka for damages caused to third parties by Wilaka's delay in performing its work on the project. [*Id.* at 906]

The court went on to comment on the specific language in the bond;

> These provisions make it clear that the primary concern of the owner in obtaining the performance bond was to protect it against any claims which might be made against it. This conclusion is reinforced by the limitation of the measure of the surety's liability under the bond to the amount payable by the owner to Wilaka under the contract. If the bond were intended to protect the owner against all claims arising out of misperformance by Wilaka, such delays which could well result in damages in excess of the contract sum, i.e., if it were

insurance protection against all possible liability to which the owner and the bonded contractor might be subjected, it would not be so limited. [*Id.* at 906–907]

In addition to the other factors, the court concluded that the mutual responsibility provision in the contract was intended to apply only to the contract. To benefit third parties, the bond must evidence a clear intent, yet the New York bond lacked this intent. The court noted that in all cases cited in the parties' briefs, plaintiff had been a subcontractor or supplier of the principal. Novak was a co-prime, and thus not meant to benefit. A comparison of the language in *Novak* and the case at bar reveals that the *Novak* language was much broader than the narrow and restrictive language found here. Yet, even with the seemingly inclusive language "in connection with" the contract, the court determined that the intent of the parties was exclusion rather than inclusion.

A Missouri court has also addressed this issue. In *J. Louis Crum Corp. v. Alfred Lindgren, Inc.*, 564 *S.W.*2d 544 (Mo.Ct. App.1978), the court considered the issue of co-prime claims for third-party beneficiary rights in surety bonds. Crum was awarded a prime contract for mechanical work on a university construction project, while defendant contracted to do general construction. Both parties entered into subcontracts. The Pennsylvania Insurance Company, the surety, issued a performance bond to assure Lindgren's completion of the contract. During construction, a crane collapsed causing structural damage and delaying plaintiff's completion of its contract. Crum filed a claim against the surety as a third-party beneficiary of Lindgren's prime contract and asserted that Lindgren's failure to timely perform its duties amounted to a breach of that contract. The court reviewed the facts and circumstances surrounding the execution of the contract and the purpose of the contract to ascertain the parties' intention. As both parties had identical contracts with identical purposes, a reciprocal relationship was found to exist. *Id.* at 547. The agreement for timely performance required completion of each contractor's

work in a manner so as not to impede the progress of the remaining contractors. The court noted that when one contractor fails to honor his contractual commitment, causing damage to the other parties, the mutually reciprocal contracts give rise to actions for delay and damage on the part of the injured contractors. *Id.* at 548 (citing *M.T. Reed Construction Corp. v. Virginia Metal Products Corp.*, 213 *F.*2d 337, 338–339 (5 Cir.1954)). The *Crum* court limited the application of third-party beneficiary rights to the Lindgren contract. The bond had created a duty on the part of Pennsylvania to pay labor and material claims, as the school would be obligated to do so if Lundgren defaulted. Crum's claim, however, was for recovery of increased costs sustained by Crum in the performance of its contract. These costs were not the university's (owner) obligation, and the bond had not anticipated this type of claim. As in *Novak* and *VanCor, Crum* refused to recognize the third-party claim against the surety.

The Utah Supreme Court had the opportunity to review this issue in *Church of Jesus Christ v. Hartford Accident Indem. Co.*, 98 *Utah* 297, 95 *P.*2d 736 (Supreme Ct.1939). Plaintiff hired a contractor to furnish marble for the church and Childs was hired to install the marble. Hartford issued a performance and payment bond securing the contractor's performance. The contractor defaulted on its supply of marble, causing delay to the project. Childs claimed against the contractor and the surety.

Each contract had contained a mutual responsibility clause which enabled damaged contractors to settle claims against damaging contractors. The wording of the bond was similar to Bilman's in that a condition of the bond required the contractor's faithful performance of the contract, satisfaction of all claims and demands, and prompt payment to those suppliers of labor and materials.

The Utah court found Child to be a third-party beneficiary of the contract as against the contractor, but the claim against the surety under the bond was dismissed. "The contract cannot be

used to impose a liability not contemplated by the bond." *Id.*, 95 *P.*2d at 749. The only beneficiary intended under the bond was the owner/obligee. Neither the owner nor the surety had intended to confer this right on any others.

In support of its position, MGM cites *Amelco Window Corp. v. Federal Insurance Co.*, 127 *N.J.Super.* 342 (App.Div.1974). Amelco subcontracted with Bogert, the general contractor, to install windows on a Rutgers University project. Bogert had furnished a performance bond to the university, with Federal as surety. The bond was executed according to terms and conditions set forth in the Bogert-university contract, and incorporated that contract into the bond by reference. A condition of the bond required that Bogert perform every act required under the contract or Federal would pay losses to the university. Bogert defaulted before completion of the project, and Amelco brought suit against Federal. The issue raised was whether a subcontractor could claim third-party beneficiary rights in the surety bond which contained no express provision for the payment of unpaid subcontractors, when the general contract required the principal to pay labor and material claims. The Appellate Division first considered surety bonds in general and determined that a third-party has "an enforceable right if the surety promises in the bond, either in express words or by reasonable implication, to pay money to him." *Id.* at 346. The court determined that the two documents must be considered together, as the bond incorporated the contract by reference, and concluded that a bond conditioned on full performance of the contract by the principal will favor third parties whom the principal, by the original contract, undertakes to pay.

In *Amelco*, Bogert was required, by the terms of the contract, to pay subcontractors for labor and materials provided for the project. Thus, as the bond was conditioned on performance of every term of the contract, Federal was held to have guaranteed performance of the aforementioned promise to pay. The court relied on the *Restatement, Security*, § 165 which states:

where a surety ... agrees in terms with the owner that the contractor will pay for labor and materials or guarantees ... the promise of the contractor to pay for labor and materials, those furnishing labor or materials have a right against the surety as third-party beneficiaries of the surety's contract, unless the surety's contract in terms disclaims liability to such persons. [*Amelco*, 127 *N.J.Super.* at 348.]

Amelco was held to be a third-party beneficiary of the bond.

The present case is distinguishable from *Amelco*. The *Amelco* bond was conditioned on performance, yet the contract provided that the owner was to direct the form of the principal's performance and payment. The contract language was intended to cover unpaid subcontractors and *was incorporated into the bond by reference.* In the instant case, the bond in issue contains a specific payment duty and a specific performance duty. Each can be examined separately to identify the existence or lack thereof of third-party rights. The payment obligation, as noted earlier, created third-party rights, yet those rights are conspicuously absent in the performance obligation section. The *Amelco* contract expressly indicated that the contract-principal was to pay all claims for labor and materials, and involved a subcontractor claiming third-party rights. In the instant case, subcontractors are held to have such rights, provided they worked on the project under the Bilman–NJEFA contract, as opposed to a co-prime, who did not perform under the bonded contract. *Amelco* was not concerned with co-primes, merely subcontractors. The instant bond and statute make specific provisions for subcontractors, yet do not show an intent to extend this right to non-party co-primes.

Plaintiff also relies on *Hanberry Corp. v. State Bldg. Comm.*, 390 *So.*2d 277 (Miss.1980). The decision in *Hanberry*, recognizing third-party beneficiary rights in a co-prime under a performance bond, represents a minority view. Mechanical, the principal, had promised in its contract to coordinate its operations with the other co-prime. Aetna issued a bond to guarantee Mechanical's performance under the contract. Mechanical defaulted on its promise to coordinate its performance with the other primes, whereupon Hanberry sought damages for the

delay. The court determined that Hanberry was entitled to claim as a third-party beneficiary under the bond. *Hanberry* was predicated on the obligations imposed by the mutual responsibility provisions of the contracts and the contemplation of the parties and the surety to these provisions. Reliance on *Hanberry* fails to take into account the exclusive remedy provisions of the contracts in the present case. The sounder analysis would reflect the language of the various contract documents and the intent of the parties in excluding a direct action against the surety on the performance obligation of the bond.

Although the instant case involves a single bond instrument, both payment and performance obligations are included. Bilman and NJEFA specifically created third-party rights, under the payment portion, in those persons who furnished labor and materials under Bilman's prime contract. The only named beneficiary under the performance bond was NJEFA. F & D asserts, and the court agrees, that the facts and circumstances indicate that this omission was intentional. Bilman and NJEFA knew how to create third-party rights in a bond, yet chose not to make MGM a beneficiary under either provision of the bond.

F & D and NJEFA both point to the "no damage for delay" and "extension of time" provisions as further considerations in support of their position. These sections of the contract provide:

The Authority shall not be liable or responsible or answerable in any way for any damages or extra cost caused by any delay, disruption, hindrance or suspension of the work or delay in its performance, whether avoidable or unavoidable, including but not by way of limitation any delays or disruptions, hindrances or suspensions caused by any act or omission on the part of the Authority, or the A/E, the Contractor itself, or any other Contractor employed on the work....

. . . .

It is understood and agreed that the provision for extension of time or performance as hereinabove provided shall be in lieu of and in liquidation of any claim against the Authority for any damages or extra cost to the Contractor,

because of any delay, disruption, hindrance or suspension due to any of the causes set forth in this paragraph....

All prime contracts executed with NJEFA contain a "no damage for delay" clause. This clause bars co-primes from asserting claims for delay damages against NJEFA, no matter who caused the delay, even a co-prime. F & D asserts that this evidences NJEFA's decision not to benefit co-primes in any way. The only recourse for co-primes suffering damages is a claim against the delaying co-prime, yet there is no intent to extend this claim against a co-prime's surety.

"No damage for delay" clauses have been addressed extensively by New Jersey courts. The Supreme Court addressed this issue in *Ace Stone, Inc., v. Wayne Twp.*, 47 *N.J.* 431 (1966). Ace Stone was the lowest general construction bidder on a sewer line and began work on the project only to discover that two of the three sites could not be readied for construction. Apparently, the township had not acquired all of the necessary easements and rights-of-way, and the project was delayed as a result.

Ace Stone made a claim for its additional expenses but upon completion of the project was told that the claim had been denied. A "no damage for delay" clause had been included in the contract, with an extension of time listed as the sole remedy available to the contractor. The Court determined that upon entry into a construction contract which contains a "no damage for delay" clause, the parties normally contemplate that the contractor bears the risk of ordinary delay. *Id.* at 437–438.

Under normal circumstances, an extension of time would be the sole remedy, as that is what the parties intended at execution of the contract. The record in *Ace Stone*, however, was devoid of any evidence relating to the attendant circumstances regarding contract completion and whether those facts indicated an intention that the extension of time clause precluded Ace Stone's assertion of a claim. As the clause was primarily designed to deal with delays which occurred after the commencement of construction, the court remanded the case for the

submission of evidence on the intent of the contracting parties. In the case at bar, a review of the contract reveals the intent of the parties and its applicability to the "no damage for delay" provision. The delays contemplated by the clause included those occurring as a result of one party's failure to complete its contractual obligations. Here, Bilman failed to perform under its contract, and it was necessary to substitute a contractor to perform. The "no damage for delay" provision was clearly applicable, and there is no unresolved issue of intent.

The issues of an extension of time as the sole remedy for delay, and nonallowance of damage claims, were addressed by the Appellate Division in *Gherardi v. Trenton Bd. of Educ.*, 53 *N.J.Super.* 349 (App.Div.1958). Defendant hired five contractors to build a school. Plaintiff was the general contractor and was to complete its contract within 400 days, 35 days after the assigned completion date for the four other contractors.

Plaintiff's contract provided that if Gherardi was delayed in completing its contract through the fault of either the owner or the other contractors, then the time for plaintiff to complete its contract would be extended commensurate with the length of the delay. The other contracts provided that those contractors were to coordinate their work with Gherardi and complete their jobs so as not to delay other contractors. A number of subcontracting delays occurred, and the project was delayed for 11 months. Although plaintiff notified the architect of the delay, he never requested an extension of time. Plaintiff subsequently claimed damages arising out of the subcontractors' delays in breach of their contracts.

The court determined that the contract had anticipated these types of delays, and the extension of time was specified as the sole remedy. Unfortunately, plaintiff failed to avail himself of that remedy. *Id.* at 360–361. Gherardi entered into the contract with full knowledge of its contents, and was held bound to that agreement. In addition to the time extension, the specifications provided that "no payment or allowance shall be made

to the contractor as compensation for damages arising out of delays." *Id.* at 362. That clause was held as a complete bar to plaintiff's claim.

Where a party to a contract containing a no damage clause acts within the fair and legal import of its terms, he cannot be deprived of the benefit of his agreement, unless, since every contract implies fair dealing between the parties, his conduct indicates bad faith or some other tortious intent. [*Id.* at 365]

The Appellate Division could find no allegation of bad faith, or tortious intent, and as the delays were usual ones occurring frequently in these types of contracts, the contractor was held to have accepted that risk when he entered into the contract.

Delay damages was also raised in *A. Kaplen and Son Ltd. v. Housing Auth. of Passaic,* 42 *N.J.Super.* 230 (App.Div.1956). Kaplen was the contractor for a public housing project. The contract provided that work was to be completed in 550 days, with the site released to the contractor within 180 days after the notice to proceed. A delay clause provided that should the site not be released, the date for completion would be extended by the number of days delayed, but no damages for delay were to be paid to the contractor.

The project was delayed, and plaintiff claimed $159,541.41 in damages it allegedly sustained as a result. The authority admitted the delays but submitted that they were anticipated in the contract, and relied on the "no damage for delay" clause to limit Kaplan's remedy to the extension of time.

The court concluded that the contract had indeed contemplated the very contingency upon which Kaplen sued. The "no damage for delay" clause was an express stipulation to the contract. *Id.* at 233. To allow Kaplen to claim damages contrary to the provisions of the contract would put plaintiff in a better position than that intended by the parties. All cases cited by plaintiff for the proposition that the exculpatory clause should not bar a claim for damages involved what the court called "exceptional situations." These would include a delay not contemplated by the contract, a delay deemed to be an abandonment or a delay caused by bad faith or interference.

*Id.* at 234–235. As none of these circumstances were present, Kaplen was not entitled to claim damages. The clause was a complete bar to recovery.

As to the issue presented on F & D's motion, the holdings of *Ace Stone, Gherardi* and *Kaplen* indicate that absent exceptional circumstances a "no damage for delay" clause is a proper contractual device for restricting or eliminating damage claims. So too, the existence of such a clause is a clear indication of the contemplation of the parties including the surety in assessing the respective responsibilities and liabilities of the parties in connection with these contracts. In determining the issue of intent, lawful provisions such as this clause in question become critical pieces of the mosaic.

Another factor F & D relies upon is the penal sum provision of the bond. The contract provided that the penal sum was to equal the contract price, or in this case, twice the contract price as the performance and payment bond were contained in a single instrument. NJEFA, by this requirement, intended to benefit only itself. As F & D and NJEFA argue, had the parties intended co-primes to claim under the bond, it would have increased the penal amount to reflect these additional contingent claimants. Failure to increase the penal amount with allowance of third-party claims would possibly deplete the penal sum available to indemnify NJEFA. F & D supports this argument with reference to the 80–day statutorily-required injunctive period, which prevents a supplier from claiming against a surety until 80 days after acceptance of the project by an authorized board. *N.J.S.A.* 2A:44–145. The purpose behind this delay period is to prohibit premature suits by early-finishing suppliers, and to prevent depletion of the penal sum. *Maurice E. Keating, Inc. v. Township of Southhampton,* 149 *N.J.Super.* 118 (App.Div.1977). Both F & D and NJEFA submit that had the Legislature intended to include co-primes in the class of persons entitled to claim against the penal sum, the 80–day limitation would have been imposed specifically on co-primes as well as the suppliers.

The purpose of the statutory bond provisions, *N.J.S.A.* 2A:44–143 *et seq.*, is to protect the governmental agency and ultimately the public against the burden of financial responsibility which may be imposed by defaulting contractors. To allow recovery for damages for delay by a third party which might impact on the sums available to the public agency is relief which must be reflected by a clear intent and understanding of the contracting parties that such parties were to benefit in that way. Such is not the case here.

Sussna argues that should F & D be held liable to pay, it should not be limited, in liability for damages, to the penal sum of the bond. In support of this proposition, it cites *Continental Realty Corp. v. Andrew J. Crevolin, Co.*, 380 *F.Supp.* 246 (S.D.W.Va.1974). Continental, the owner, contracted with defendant Oakridge for hotel construction. General issued a surety bond on behalf of Oakridge, with a penal sum of $150,000 less than the cost of the contract. Substantial delays hindered completion of the project. Two months after the anticipated completion date, Oakridge was declared in default, and General was called upon to fulfill its obligations. General sought to avoid these duties, as it claimed that the delays were caused by factors not within the responsibility of Oakridge, and General had no duty to act. The court found that Oakridge had acted in a manner violative of its obligations under the contract, in abandoning the project, and subjecting the project to property damage. Since General failed to fulfill its obligations under the bond, despite repeated requests to do so, Continental claimed it was entitled to sums in excess of the penal amount. Upon the declaration that Oakridge was in default under the contract, a duty arose in General to take over, and assume completion of the contract, within 15 days, and be entitled to payments of the balance of the contract price.

The court noted the general rule that sureties may not be held liable for sums in excess of the penal amount of a bond. *Id.* at 252 (citing *State ex rel Mayle. v. Aetna Casualty and Surety Co.*, 152 *W.Va.* 683, 166 *S.E.*2d 133 (1969)). However,

since General breached its obligation to Continental, the liability for that breach was determined to be actual damages and not an amount limited by the penal sum of the bond. The surety agreement contained no limit of liability for the surety's own breach. As General breached its agreement, the court determined that it should be held liable for resulting damages.[2]

The Bilman contract documents limit the remedies available to a damaged contractor. The indemnification provision requires a co-prime to indemnify NJEFA against claims. The "no damage for delay" provisions bar claims by co-primes against NJEFA for damages resulting from delays. The mutual responsibility provision enables co-primes to claim against other co-primes, the architect, or the engineer for delays. These clauses evidence that the only course of action a co-prime can take is one against the delaying co-prime. Considering these provisions in light of the bond provisions of penal sum amount and 80-day claim limitation leads to the obvious conclusion that NJEFA had no intention of creating yet another remedy—an action against a delaying co-prime's surety—unless that remedy was set forth with clear intent and specificity. This court is of the opinion that the majority rule as set forth in *VanCor, Novak, Crum* and *Church of Jesus Christ* is a sound one. MGM entered into a contract with a clear understanding of its rights and obligations not only in reference to NJEFA but with the co-primes as well. The remedies for default are set forth with specificity, and MGM is limited to those remedies. The performance bond provided to Bilman by F & D was intended to benefit NJEFA and no others. No third-party rights were created for the benefit of MGM, and it cannot claim as a third-party beneficiary under this bond. The sixth count of the complaint is dismissed.

---

[2]*Continental* may well be applicable to other causes of action raised by MGM's recent amendment to its complaint, but it does not support Sussna's position in reference to the motion to dismiss the sixth count of the complaint.